**No. 21-6076**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

―――――――――――――――――――

### LISA PRICE,

Personal Representative of the Estate of Nickie Miller,

Plaintiff-Appellant

v.

### MONTGOMERY COUNTY, KY, *et al.*,

Defendants-Appellees

―――――――――――――――――――

On Appeal from the United States District Court for the Eastern District of
Kentucky, Lexington Division
District Ct. No. 5:18-cv-619
Chief Judge Danny C. Reeves Presiding

―――――――――――――――――――

## BRIEF OF APPELLANT LISA PRICE

Debra Loevy*
Elliot Slosar
Amy Robinson Staples
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900
*Counsel of Record

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1, Plaintiff-Appellant makes the following disclosures:

    1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No.

    2.    Is there a publicly owned corporation, not party to the appeal that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

    No.

                 /s/ Debra Loevy
                 Counsel of Record for Plaintiff-Appellant
                 Lisa Price

Debra Loevy
Elliot Slosar
Amy Robinson Staples
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................................1

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW .......................................................2

STATEMENT OF THE CASE................................................................3

Introduction ........................................................................3

    1.  The First Four Years of the Brewer Murder Investigation ........................4

    2.  Defendants Question Jessica Richmond and Christina Larrison ..............7

    3.  Natasha Martin's Eventual Confession and Implication of Plaintiff .........8

        A. Defendants' Interrogation Before the Polygraph Exam...................9

        B. Defendant Fyffe's Interrogation and Polygraph Examination.......12

        C. Defendants' Post-Polygraph Interrogation Resulted in Martin's Statement, the Only Evidence Ever Allegedly Inculpating Plaintiff..............................................................18

        D. Martin Recants Her Statement and Rescinds Her Recantation......23

    4.  Defendant Craycraft's Destruction of Evidence .......................24

    5.  Plaintiff's Prosecution ..............................................25

    6.  Defendants' Continued Efforts to Influence Martin's Testimony ..........26

    7.  The Charges Against Plaintiff Are Dismissed and This Lawsuit Ensued ................................................................28

i

ARGUMENT SUMMARY ......................................................................29

ARGUMENT ........................................................................................31

I.    Legal Standards for Adjudicating this Appeal ........................31

    A. Review of the District Court's Summary Judgment Rulings..............31

    B. Review of the District Court's Dismissal of Defendant Craycraft .....32

II.    Summary Judgment Was Erroneously Granted on Plaintiff's Fabrication of Evidence Claim ........................................................32

    A. Plaintiff Presents a Viable Claim Based on Fabrication of Evidence ...............................................................................32

    B. Defendants Are Not Entitled to Qualified Immunity for Their Fabrication ..........................................................................38

III.    Plaintiff is Entitled to Trial on His Malicious Prosecution Claim ..........41

    A. The Elements of Malicious Prosecution Claims ................................41

    B. A Trial is Warranted on Plaintiff's Malicious Prosecution Claim......42

      1.  There is Sufficient Evidence for a Jury to Find Defendants Influenced and Participated in the Decision to Prosecute Plaintiff............................................................................42

      2.  Absent Martin's Fabricated Statement, There Was No Probable Cause to Prosecute Plaintiff ...............................................48

      3.  Plaintiff Suffered a Deprivation of Liberty....................................50

      4.  Plaintiff Presents Sufficient Evidence of Favorable Termination of His Criminal Proceedings ..............................................50

      5.  Plaintiff Presents Sufficient Evidence on All Elements of This Claim ..............................................................................51

IV.    The Complaint's Claim Against Defendant Craycraft Should Be Reinstated ................................................................................52

V.    Plaintiff's Derivative Federal Claims and State Law Claims Should Be Reinstated ................................................................................55

   A. Plaintiff's Failure to Intervene Claim Merits a Trial .........................55

   B. A Trial is Warranted on Plaintiff's Federal Conspiracy Claim ..........56

   C. A Trial is Warranted on Supervisory Liability ...................................57

   D. Plaintiff's State Law Claims Should Be Reinstated............................58

CONCLUSION ........................................................................58

# TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................................31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................57

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993)..........................................................52

*Burns v. Reed*, 500 U.S. 478 (1991) ...................................................................52, 54

*Butz v. Economou*, 438 U.S. 478 (1978)...................................................................53

*Cataldo v. United States Steel Corp.*, 676 F.3d 542 (6th Cir. 2012) ......................50

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................31

*Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844
   (5th Cir. 1991) .....................................................................................................55

*Davis v. Gallagher*, 951 F.3d 743 (6th Cir. 2020)...................................................48

*Dickerson v. United States*, 530 U.S. 428 (2000) ....................................................37

*Forrester v. White*, 484 U.S. 219 (1988) .................................................................54

*Gagan v. Norton*, 35 F.3d 1473 (10th Cir. 1994) ....................................................54

*Gambrel v. Knox Ctny., Ky.*, 25 F.4th 391 (6th Cir. 2022)......................................32

*Garza v. Lansing Sch. Dist.*, 972 F.3d 853 (6th Cir. 2020) .....................................31

*Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015) ..........................39, 40

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) ................32, 33, 40, 48

*Hale v. Kart*, 396 F.3d 721 (6th Cir. 2005) .............................................................48

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014).......................................................33

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982).............................................................52

*Hatchett v. City of Detroit*, 495 F. App'x 567 (6th Cir. 2012) ................................53

*Howell v. Sander*s, 668 F.3d 344 (6th Cir. 2012) ....................................................52

*Hudson v. Hudson*, 475 F.3d 741 (6th Cir. 2007)........................................24, 32, 41

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ..................................................... *passim*

*Illinois v. Gates*, 462 U.S. 213 (1983) ......................................................................36

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ...........................................................52, 55

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ....................................33

*Jones v. Clark County*, 959 F.3d 748 (6th Cir. 2020)........................................50, 51

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017)...................................30, 48, 49, 51

*Leath v. Webb*, 323 F. Supp. 3d 882 (E.D. Ky. 2018) ..............................................48

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019)...........................................33

*Llamas v. Oregon*, 548 U.S. 331 (2006)....................................................................37

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) .......................................................48

*Munchinski v. Solomon*, 747 F. App'x 52 (3d Cir. 2018)........................................53

*Napue v. Illinois*, 360 U.S. 264 (1959) ....................................................................40

*Odd v. Malone*, 538 F.3d 202 (3d Cir. 2008)...........................................................55

*Peroli v. Huber*, 2021 WL 5411215 (6th Cir. Nov. 19, 2021) ................................52

*Saucier v. Katz*, 533 U.S. 194 (2001) .......................................................................39

*Sheffey v. City of Covington*, 564 F. App'x 783 (6th Cir. 2014) .......................55, 56

*Smith v. Heath*, 691 F.2d 220 (6th Cir. 1982)...........................................................56

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) .............................33

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999)............................30, 39, 41, 51

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) .....................................................42

*Tlapanco v. Elges*, 969 F.3d 638 (6th Cir. 2020) .....................................................42

*Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472 (6th Cir. 2020)..........31

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009)......................................................54

*Washington v. Buraker*, 322 F. Supp. 2d 702 (W.D. Va. 2004)..............................38

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005)............................................38

*Watkins v. Healy*, 986 F.3d 648 (6th Cir. 2021) ......................................................54

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015).....................................*passim*

*Wilkinson v. Ellis*, 484 F. Supp. 1072 (E.D. Pa. 1980)............................................54

*Yarris v. County of Delaware*, 465 F.3d 129 (3d Cir. 2006) ...................................53

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56(a)...................................................................................................31

Restatement (Second) of Torts § 660 cmt. (d) (1977) ..............................................50

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument under Fed. R. App. P. 34(a)(1) and Sixth Cir. R. 34(a). Oral argument would likely assist the Court in its adjudication.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff's federal claims under 28 U.S.C. §1331 and state law claims under 28 U.S.C. §1367. Final judgment was entered on November 5, 2021. R.152, SJ Opinion, PAGE ID # 3870-3905. Notice of appeal was timely filed on November 13, 2021. R.154, Notice of Appeal, PAGE ID # 3908. Jurisdiction in this Court is proper under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Is a jury trial warranted on Plaintiff's §1983 claims arising from Defendants' efforts to frame Plaintiff for a crime he did not commit where evidence demonstrates that Defendants secured the only evidence ever purportedly implicating Plaintiff—the inculpatory statement of a supposed accomplice—by fabricating the statement for the witness and threatening and coercing her to adopt that statement?

2.    Are Defendants entitled to qualified immunity where applicable law was clearly established at the time of their misdeeds?

3.    Should the Court reinstate Plaintiff's claims against the Defendant Prosecutor where his alleged misconduct falls outside absolute immunity protections?

4.    Should the Court reinstate Plaintiff's state law and derivative claims?

## STATEMENT OF THE CASE

### Introduction

Plaintiff Nickie Miller brought this civil rights suit after spending two years wrongfully incarcerated for a crime he did not commit, with the shadow of a possible death sentence hanging over him the whole time. R.1, Complaint, PAGE ID # 1-44; R.118-2, Miller Dep., PAGE ID # 1888, 1893, 1934-36. While wrongfully imprisoned, Plaintiff was battling cancer, which ultimately became a death sentence; he passed away on January 17, 2022. R.118-2, Miller Dep., PAGE ID # 1847, 1924-25; Dkt. 22.[1]

The sole basis for Plaintiff's arrest and incarceration was a supposed confession procured by Defendants from alleged co-defendant Natasha Martin. R.118-4, Shortridge Dep., PAGE ID # 2163-64. As detailed below, Plaintiff alleges that Defendants wholly fabricated Martin's statement, fed it to her, intentionally coerced her with threats and promises to falsely implicate Plaintiff, and suppressed evidence of this manipulation, all while ignoring compelling evidence against the true culprit.

---

[1] On March 8, 2022, Mr. Miller's estate was substituted as Plaintiff in this appeal. Dkt. 30-2. This brief nevertheless refers to Mr. Miller as Plaintiff. Counsel believes the title is helpful for distinguishing Mr. Miller from the many other names arising in this investigation.

### 1. The First Four Years of the Brewer Murder Investigation

On December 22, 2011, Paul Brewer was found murdered in his home, tied to his bed, with two gunshot wounds. R.118-10, Case File, PAGE ID # 2280, 2239. Over the next nine months, seven separate witnesses—Natasha Martin, Cody Hall, Michelle Lawson, Kennie Helton, Misty Dehart, Timothy Robinson, and Anthony Hawkins—each independently told Defendants that they heard a man named Rick Mize implicate himself as the shooter in this homicide or heard mention of it, while none of these witnesses inculpated Plaintiff. R.118-3, Charles Dep., PAGE ID # 2069-70, 2074, 2075, 2077; R.118-10, Case File, PAGE ID # 2299-2301, 2305. In December 2014, three years after the crime, witness Shelly Poe told Defendant investigators that Rick Mize was still bragging about committing the murder. R.118-3, Charles Dep., PAGE ID # 2085. In fact, by then there were ten separate witnesses implicating Rick Mize. *Id.*, PAGE ID # 2109. Rick was known to Defendants as a career criminal. *Id.*, PAGE ID # 2060. When asked to take a polygraph in this case, he was unable to do so because of an alleged medical issue, but the exam was never rescheduled. *Id.*, PAGE ID # 2085; R.118-12, Fyffe Dep., PAGE ID # 2591-92; R.118-10, Case File, PAGE ID # 2499; R.118-11, Collier Dep., PAGE ID # 2553. Nevertheless, Defendants focused their investigation on inculpating Plaintiff.

4

The seeds of this myopic focus were planted on February 3, 2012, when lead detective on the case, Defendant Charles, claims that he ran into two officers from different jurisdictions, who happened to have information about his case. R.118-3, Charles Dep., PAGE ID # 2058-59. According to Defendant Charles, those officers informed him that Rick Mize's brother, Bobby Mize, had allegedly fingered Plaintiff and his friend Cody Hall as culprits in a multi-county burglary ring possibly related to the Brewer murder. *Id.*, PAGE ID # 2059. Defendant Charles never sought information about the supposed burglary ring, but he did interview Bobby Mize. *Id.*, PAGE ID # 2059, 2062.

At that meeting, Bobby Mize implicated Plaintiff, Cody Hall, and Michelle Lawson for the Brewer murder, raising their names as possible suspects for the first time. *Id.*, PAGE ID # 2061-62; R.118-10, Case File, PAGE ID # 2295. Bobby claimed to have first-hand information about a supposed confession made shortly after the murder, though he had been incarcerated at the time. R.118-3, Charles Dep., PAGE ID # 2071; R.118-10, Case File, PAGE ID # 2295.

When Defendant Charles interviewed Bobby Mize about the Brewer murder, he was incarcerated and, according to Charles, "notorious" for seeking deals with law enforcement to get out of prison. R.118-3, Charles Dep., PAGE ID # 2061. Despite this, Defendant Charles met on February 7 and 10, 2012, to help get Bobby Mize out of prison in exchange for assistance in investigating this murder. *Id.*,

PAGE ID # 2069. Defendant Charles did not document either of these meetings or their deal in the case reports. *Id.*, PAGE ID # 2067; R.118-10, Case File, PAGE ID # 2294-98.

Defendant Charles' agreement with Bobby Mize was that in exchange for Charles' assistance in getting Bobby out of prison, Bobby would secretly record his brother Rick Mize to see if Rick had been involved in the murder. R.118-3, Charles Dep., PAGE ID # 2062-63. However, Bobby never recorded anything. *Id.* Duped by the false promise of a recording and unable to corroborate any information Bobby provided, Defendant Charles' supervisor, Defendant Sheriff Shortridge, acknowledged that Bobby Mize "played us" "to get him out of jail." R.118-4, Shortridge Dep., PAGE ID # 2167.

All three of those accused by Bobby—Plaintiff, Cody Hall, and Michelle Lawson—were excluded from all DNA found at the murder scene, and there have never been any fingerprints, other physical evidence, eyewitnesses, or inculpatory statements from Plaintiff, Hall, or Lawson supporting Bobby's allegations. R.118-3, Charles Dep., PAGE ID # 2055, 2083; R.118-10, Case File, PAGE ID # 2432, 2436, 2439; R.118-24, DNA Results, PAGE ID # 2715; R.118-23, DNA Results, PAGE ID # 2713; R.118-4, Shortridge Dep., PAGE ID # 2186. DNA evidence excluding Plaintiff, Hall, and Lawson included: a sexual assault kit, fingernail clippings, wrist restraints, a blindfold, a pair of stockings, underwear, and

6

bloodstained bed sheets. R.118-18, Forensic Report, PAGE ID # 2700; R.118-3, Charles Dep., PAGE ID # 2072.

Despite ten separate witnesses implicating Rick Mize and Rick's polygraph exam remaining outstanding, Defendants never even interviewed Rick —who any reasonable investigator would have considered to be the lead suspect in this murder investigation. R.118-3, Charles Dep., PAGE ID # 2084-85, 2109; R.118-11, Collier Dep., PAGE ID # 2529, 2533, 2553; R.118-12, Fyffe Dep., PAGE ID # 2591-92; R.118-10, Case File, PAGE ID # 2499. Instead, Defendants treated this as a "cold" case for almost four years. R.118-3, Charles Dep., PAGE ID # 2084-85, 2109.

This "cold" case status changed in October 2015, when Kennie Helton, an alleged witness who had formerly accused Rick Mize, was seeking consideration on pending felony charges and implicated Plaintiff and Cody Hall in the murder. *Id*., PAGE ID # 2074, 2086. Additionally, Helton told investigators that Rick Mize told her that two women were involved in the offense, Jessica Richmond and Christina Larrison. R.118-10, Case File, PAGE ID # 2318-19.

### 2. Defendants Question Jessica Richmond and Christina Larrison

After Helton's accusations, Defendants questioned Richmond. Richmond knew nothing about the murder except for rumors about two women luring a man

to rob him, but something went wrong. R.118-10, Case File, PAGE ID # 2319.

Richmond did not implicate anyone. *Id.*

When Defendants questioned Larrison after Helton's accusations, Larrison

implicated Natasha Martin, but in doing so, she told Defendants a version of the

crime they knew was contrary to the physical evidence. *Id.*; R.118-3, Charles Dep.,

PAGE ID # 2090-91. Larrison said that Martin told her: Martin had participated in

the crime, Hall hit the decedent over the head to get the code to the decedent's

safe, and Plaintiff shot the victim. *Id.* But, Defendants knew that Larrison's

statement was false and unreliable because when they spoke to her, they knew that

there was no safe and that the decedent was not hit on the head. *Id.*, PAGE ID #

2090-01, 2109; R.118-10, Coroner's Report, PAGE ID # 2335-36, 2342.

### 3.  Natasha Martin's Eventual Confession and Implication of Plaintiff

Although Larrison's information was inaccurate, Defendants nevertheless

focused on Martin. R.118-3, Charles Dep., PAGE ID # 2090-01, 2109; R.118-10,

Coroner's Report, PAGE ID # 2335-36, 2342. Defendants had originally spoken to

Martin in September 2012, early in the investigation. R.118-3, Charles Dep.,

PAGE ID # 2075. Martin had been cooperative, answered all questions, gave a

DNA sample, and reported the rumors she had heard about the murder: the Mize

brothers were responsible. *Id.*, PAGE ID # 2075-76. Martin denied any

involvement and did not know the victim or the location of the crime. *Id.*, PAGE

ID # 2076-77. Martin informed Defendants that although she had previously been married to Hall, the two had been separated for years, and she had not spent time with Hall or Plaintiff since 2010. *Id.*

Based on Larrison's false account of the murder (with the nonexistent safe and nonexistent assault on the victim's head), Defendants brought Martin in for questioning on November 12, 2015. *Id.*, PAGE ID # 2088, 2090-91; R.118-10, Coroner's Report, PAGE ID # 2335-36, 2342. That interrogation had three components: questioning before the polygraph, an interrogation by the polygraph examiner, and an interrogation afterwards.

### A. Defendants' Interrogation Before the Polygraph Exam

Although department protocol required Defendants to record the entire interrogation, Defendants' seven-and-a-half hour interrogation of Martin before the polygraph was recorded only sporadically. R.118-4, Shortridge Dep., PAGE ID # 2166, 2170; R.118-6, Martin Dep., PAGE ID # 2251, 2253; R.118-65, Martin Letter, PAGE ID # 3468; R.118-66, Martin Letter, PAGE ID # 3472-73; R.118-67, Martin Letter, PAGE ID # 3480. Defendants could not explain why most of this key interrogation was unrecorded. R. 118-3, Charles Dep., PAGE ID # 2046, 2094.

Defendants Charles and Collier conducted the pre-polygraph interrogation, during which Martin: maintained her innocence; denied first-hand knowledge of the crime; did not implicate herself, Hall, or Plaintiff; and maintained that at the

time of the crime, she was estranged from Hall, hated by Plaintiff, and living with an abusive man who kept constant tabs on her whereabouts and never would have allowed her to participate in a crime with her estranged former husband and Plaintiff. *See, e.g.,* R.118-3, Charles Dep., PAGE ID # 2089, 2094; R.118-11, Collier Dep., PAGE ID # 2540; R.118-28, Martin Interrogation, PAGE ID # 2727, 2729-30, 2732-33, 2735-39, 2744, 2746, 2748-50, 2754-58, 2761, 2768-69; R.118-30, Fyffe Interrogation, PAGE ID # 2890, 2904.

Defendants employed several tactics to try to get Martin to confess to the murder during this interrogation session. First, they repeatedly falsely told Martin that her DNA had been found at the murder scene. R.118-28, Martin Interrogation, PAGE ID # 2745, 2747, 2761-62, 2765; R.118-3, Charles Dep., PAGE ID # 2089-90; R.118-11, Collier Dep., PAGE ID # 2540; R.118-4, Shortridge Dep., PAGE ID # 2171, 2174. Defendants knew what they told Martin was a lie—all DNA testing excluded Martin except for one result that was merely inconclusive about excluding her from a mixed sample (that DNA sample was also inconclusive about excluding the decedent's girlfriend and was similarly inconclusive as to one out of every sixty-seven random people). R.118-3, Charles Dep., PAGE ID # 2080-81; R.118-23, DNA Results, PAGE ID # 2713; R.118-4, Shortridge Dep., PAGE ID # 2174. Certainly, no DNA affirmatively placed Martin at the murder scene. *Id.*

10

Second, Defendant Charles repeatedly falsely told Martin that several people had given sworn statements implicating her in the murder. 118-3, Charles Dep., PAGE ID # 2090; R.118-28, Martin Interrogation, PAGE ID # 2729-30, 2744-46, 2758, 2761, 2763. Defendant Charles knew this too was a lie—the only witness who ever implicated Martin was Larrison, whose account was provably false because it centered around a non-existent safe and a head beating that never happened. R.118-3, Charles Dep., PAGE ID # 2090-91, 2109; R.118-10, Coroner's Report, PAGE ID # 2335-36, 2342.

Third, Defendants fed Martin information about the murder that only the police or the actual perpetrator would know, thus ensuring that any statement she gave would sound plausible. For example, before speaking to Defendants, Martin did not know where the crime occurred. R.118-28, Martin Interrogation, PAGE ID # 2753; R.118-6, Martin Dep., PAGE ID # 2252-53; R.118-11, Collier Dep., PAGE ID # 2540, 2543. This was key information for Defendants not to feed so they could test Martin's knowledge of the crime. R.118-4, Shortridge Dep., PAGE ID # 2176-77; R.118-11, Collier Dep., PAGE ID # 2541-42 (the crime scene location was a "key piece[] of evidence" Defendants held back as evidence, because "no one else would know unless they were there"). But Defendants told Martin this key evidence, telling her the town (and eventually, as detailed below, the street address). R.118-3, Charles Dep., PAGE ID # 2093; R.118-4, Shortridge

11

Dep., PAGE ID # 2177; R.118-28, Martin Interrogation, PAGE ID # 2753.

Defendants also fed Martin their theory of the case—that the women's

involvement in facilitating the murder was setting up a sexual encounter with the

decedent. R.118-28, Martin Interrogation, PAGE ID # 2767-68.

And fourth, Defendants foreshadowed their threats and promises by planting

the idea that a confession was "important to [Martin's] family" and that

Defendants could "give [her] an advantage" if she confessed. R.118-28, Martin

Interrogation, PAGE ID # 2753, 2755; *see also id.*, PAGE ID # 2768. As detailed

below, Defendants later built this into a more explicit threats to take her children

and promises of no consequences if she confessed.

Throughout this initial pre-polygraph interrogation, Martin repeatedly

begged to take a lie detector test to prove her innocence and volunteered to wear a

wire to help with the investigation. *See, e.g.,* R.118-28, Martin Interrogation,

PAGE ID # 2730, 2731, 2743, 2745, 2748, 2757, 2761- 62, 2766.

### B.    Defendant Fyffe's Interrogation and Polygraph Examination

Eventually, Defendants drove Martin to Frankfort, Kentucky, for a

polygraph. R.118-3, Charles Dep., PAGE ID # 2046. Defendants Charles and

Collier contemporaneously watched the nearly three-hour test and interrogation by

Defendant Fyffe. *Id.*, PAGE ID # 2046, 2095; R.118-11, Collier Dep., PAGE ID #

2546; R. 118-4. Defendants premised the polygraph examination on the false

claims that Martin had "confessed" to the crime to multiple people and that DNA evidence at the scene inculpated her, both untrue (as addressed *supra*). R.118-29, Polygraph Report, PAGE ID # 2796, 2810; R.118-12, Fyffe Dep., PAGE ID # 2576; R.118-30, Fyffe Interrogation, PAGE ID # 2890, 2894, 2902.

Before the polygraph, Defendant Fyffe told Martin even more non-public details of the crime she later included in her confession. R.118-6, Martin Dep., PAGE ID # 2253; R.118-67, Martin Letter, PAGE ID # 3480. For instance, when Martin told Fyffe that she still did not know where the murder took place, Defendant Fyffe supplied her with the address. *Id.*; PAGE ID # 2252; R.118-30, Fyffe Interrogation, PAGE ID # 2891, 2895.

Then Defendant Fyffe expanded on Defendants' nonpublic theory of the case, that they believed the decedent was involved in sexual activity and had been tied to the bed, all new information to Martin. R.118-30, Fyffe Interrogation, PAGE ID # 2892; R.118-4, Shortridge Dep., PAGE ID # 2177; R.118-11, Collier Dep., PAGE ID # 2544. Defendant Fyffe told Martin Defendants' theory that the decedent had been engaged in a sexual encounter with two women and falsely told Martin that her DNA had been found on the left wrist restraint used to bind the decedent to the bedpost, definitively inculpating her. R.118-30, Fyffe Interrogation, PAGE ID # 2892, 2894, 2902, 2933, 2935-40; R.118-3, Charles Dep., PAGE ID # 2080, 2098-2101; R.118-12, Fyffe Dep., PAGE ID # 2585;

R.118-6, Martin Dep., PAGE ID # 2253; R.118-23, DNA Results, PAGE ID # 2713. Defendant Fyffe also invented that there were "at least two people" stating that Martin said she was present when the murder happened. R.118-30, Fyffe Interrogation, PAGE ID # 2894, 2960.

During the polygraph, Martin continued to maintain her innocence. R.118-30, Fyffe Interrogation, PAGE ID # 2918-21. Afterwards, Defendant Fyffe told Martin that she did not pass the exam: she knew who pulled the trigger and killed the decedent. *Id.*, PAGE ID # 2923-24. There is no evidence supporting that these polygraph results were reported accurately. R.118-36, Dr. Leo Expert Report, PAGE ID # 3155. Moreover, the polygraph questioning made no mention of Plaintiff and in no way implicated him in this crime. R.118-30, Fyffe Interrogation, PAGE ID # 2918-21.

Upon hearing the false results, Martin still maintained she knew nothing about the crime, but Defendant Fyffe told her that her DNA proves she put the left wrist restraint on the decedent, and she must remember the shooter's identity, or she would not have failed the polygraph. *Id.*, PAGE ID # 2926, 2929-30, 2933-34. When Martin responded by breaking down, praying, and revealing that the only thing she cares about is her three children, Defendant Fyffe returned to Defendants' tactic of threatening her family. *Id.*, *e.g.,* PAGE ID # 2930, 2938, 2945-46, 2959, 2954.

First, he doubled down on the lie about DNA proving Martin's guilt, reiterating it more and more emphatically. *See, e.g., id.*, PAGE ID # 2933 ("Your DNA come off the left restraint on his wrist, okay? Your DNA, nobody else's."); *id.*, PAGE ID # 2936 ("you had to be the person that put that left wrist restraint on him for your touch DNA to get on it."); *id.*, PAGE ID # 2938-39 ("They've got your touch DNA, and I will tell you right now, if you don't cooperate, and you don't tell the truth about what you know, they've got no problem letting you carry this burden by yourself."); *id.*, PAGE ID # 2940 ("Your touch DNA is on there."); *id.*, PAGE ID # 2949, 2958.

Second, Defendants took their threats about taking away Martin's children from veiled to explicit, expressly connecting that Martin needed to make the statement if she wanted to keep her children:

| | |
|---|---|
| Fyffe: | You don't care about your kids, do you? |
| Martin: | I love my kids. |
| Fyffe: | No, you don't. |
| Martin: | Why would you tell me that? |
| Fyffe: | Because you've got a chance right now…to fix it….And you won't do it….when you walk out of here, it's done….If you lose them, then that's on you. |

*Id.*; PAGE ID # 2953-54.

Defendant Fyffe also scared Martin with, "If you carry this load by yourself and they have to use that DNA, your kids are gone probably for a long time, not because they want it, but because they're going to have to do something to you." *Id.*, PAGE ID # 2949. He continued, "they need a witness….If you're a witness, nobody wants your kids. He don't want them. I don't want them. Social Services don't want them. Nobody wants them. You -- the only friends you've got right now…are right here." *Id. See also id.*, PAGE ID # 2957 ("Right now, it's a matter of do I love my kids enough to tell the truth."); *id.*, PAGE ID # 2946 ("what you need to think about, is them three babies at home.").

Defendant Fyffe also used a combination of threats and promises—if Martin did not make the inculpatory statement naming Plaintiff as the shooter, she alone would be prosecuted and suffer dire consequences; but if she gave the statement, she would suffer no repercussions:

> They want to know who pulled the trigger….That's all they care about, and that's what they've told me. I got no problem standing up in front of a judge and saying when Natasha told me the truth, my understanding was that the prosecutor said she was going to walk for tying this guy up… and when the guy shot him, she didn't know about that. I got no problem with that. That's what they told me, okay? They're not looking to put you six foot underground. They want the person that pulled the trigger. It's a murder.

*Id.*, PAGE ID # 2941-42. *See also id.*, PAGE ID # 2938 ("the prosecutor doesn't want anything out of you except who pulled the trigger, and you walk."); *id.*, PAGE ID # 2939 ("they've got no problem letting you carry this burden by

yourself."); *id.*, PAGE ID # 2939-40 (similar); *id.*, PAGE ID # 2948 ("you're going to carry it all on your shoulders"); *id.*, PAGE ID # 2949 (similar).

In response to these tactics, Martin kept telling Defendants she knew nothing about the murder and was being forced to comply with their demands anyway. She told Defendants, "I love my kids more than anything.  I want more than anything to tell you the truth, but you don't want [the truth] – do you want me to make something up and tell you because I do not remember?"  R.118-30, Fyffe Interrogation, PAGE ID # 2957. There is no question that Martin was being instructed to adopt a statement she made clear was false; in the face of Defendants' tactics, she asked Defendants directly, "Can I have my lawyer or somebody? Because I don't know what I'm supposed to do here." *Id.*, PAGE ID # 2952.

Defendant Fyffe's strategies—convincing Martin that if she did not give a statement, she would lose her children and feeding her nonpublic details of the crime—were implemented in coordination with the other Defendants. R.118-3, Charles Dep., PAGE ID # 2097-2100, 2104-05; R.118-4, Shortridge Dep., PAGE ID # 2175-77. While implementing this strategy, Defendant Fyffe sandwiched Martin's legs between his own, touched her thigh, rubbed her arm, held her hands, and repeatedly called her honey, also with the other Defendants' approval of this sexually intimidating strategy. R.118-31, Fyffe Interrogation Video at 30:47-43:27; 51:35-52:40, PAGE ID # 2980; R.118-3, Charles Dep., PAGE ID # 2100-01;

17

R.118-11, Collier Dep., PAGE ID # 2545-46; R.118-30, Fyffe Interrogation,

PAGE ID # 2928, 2932, 2946, 2948, 2950, 2951, 2960.

This interrogation session ended with Martin praying to Jesus for help

because she did not want to be forced to lie to Defendants. R.118-30, Fyffe

Interrogation, PAGE ID # 2962.

> ### C.    Defendants' Post-Polygraph Interrogation Resulted in Martin's Statement, the Only Evidence Ever Allegedly Inculpating Plaintiff

The next portion of Defendants' interrogation occurred back at the Sheriff's

station and is again unrecorded, despite department policy requiring recording of

the session. R.118-4, Shortridge Dep., PAGE ID # 2166, 2178-79. At all times

prior to the final recorded interrogation, Martin maintained her innocence. R.118-

4, Shortridge Dep., PAGE ID # 2179. It is unclear how long this unrecorded

session lasted. *Id.*

When Defendants finally began recording the post-polygraph interrogation,

Martin was represented by counsel, who had struck an off-record deal with the

Commonwealth. Specifically, Defendant Shortridge contacted attorney James

Davis to represent Martin.  R.118-4, Shortridge Dep., PAGE ID # 2168, 2179.

Prior to the recording, Davis and Defendant Shortridge discussed a deal for Martin

if she agreed to give a statement implicating herself, Hall, and Plaintiff for the

murder.  R.118-4, Shortridge Dep., PAGE ID # 2168, 2169, 2179. Defendants told

Martin that if she gave a statement implicating herself, Hall, and Plaintiff, she would not be charged with murder that day and would be allowed to leave. *Id.*, PAGE ID # 2180. Defendants also promised that in return for her statement, she would be sentenced to diversion, with no jail time and no felony record for the murder. *Id.,* PAGE ID # 2180-82; R.118-6, Martin Dep., PAGE ID # 2252; R.118-32, Davis Dep., PAGE ID # 2995; R.118-63, Martin Letter, PAGE ID # 3450.

Defendants did not have probable cause to arrest Plaintiff until Martin's resulting statement. R.118-4, Shortridge Dep., PAGE ID # 2187. Yet the consideration they provided in exchange for Martin's statement —literally the only piece of evidence supporting Plaintiff's arrest—is not commemorated in the recorded portion of the interrogation nor in any police report. R.118-33, Martin "Confession", PAGE ID # 3018-3047; R.118-10, Case File, PAGE ID # 2272-2502; R.103-28, Interrogatory Answer No. 14, PAGE ID # 1247.

In the final recorded statement, Martin falsely confessed that she and another woman pretended they were going to have sex with the decedent and tied him up. R.118-33, Martin "Confession", PAGE ID # 3019; R.118-6, Martin Dep., PAGE ID # 2253. Martin initially claimed to have no background or motive information, could not say how she got to the decedent's house, and said that she could not remember who the second woman was. *Id.*; R.118-33, Martin "Confession", PAGE ID # 3018-21. She wavered between Kennie Helton and Kayla Walter as her

alleged accomplice, both of whom Defendants knew were excluded by the DNA evidence. R.118-3, Charles Dep., PAGE ID # 2051, 2106; R.118-4, Shortridge Dep., PAGE ID # 2182-83; R.118-10, Case File, PAGE ID # 2432, 2439.

Martin told Defendants that after tying the decedent to the bed, the women radioed Hall and Plaintiff, left the house, and then heard one gunshot. R.118-33, Martin "Confession", PAGE ID # 3020, 3023; R.118-10, Case File, PAGE ID # 2280. Defendants, however, knew Martin was incorrect about how many times the decedent had been shot. R.118-33, Martin "Confession", PAGE ID # 3023; R.118-10, Medical Examiner Report, PAGE ID # 2335.

When Defendant Charles volunteered that fishnet stockings had been found at the crime scene, Martin told him the other woman wore them. *Id.*, PAGE ID # 3035-36; R.118-10, Case File, PAGE ID # 2368. Martin then settled on her alleged accomplice, telling Defendants she was 100% positive it was Helton. R.118-33, Martin "Confession", PAGE ID # 3037. Defendants, however, knew Helton's DNA did not match the profile recovered from the stockings. R.118-3, Charles Dep., PAGE ID # 2109; R.118-4, Shortridge Dep., PAGE ID # 2182-83; R.118-11, Collier Dep., PAGE ID # 2549.

In describing the crime, Martin told Defendants that the perpetrators entered and exited through the decedent's front door and parked their car "down the street a little ways on [] the side." R.118-33, Martin "Confession", PAGE ID # 3042.

However, with the help of their canine team, Defendants had found the culprits'
tire track in a cul-de-sac immediately behind the decedent's townhouse. R.118-10,
Case File, PAGE ID # 2282.

Defendants acknowledged there was no reason to correct Martin about
where the culprits' car was parked—it was something she should have known if
she had personal knowledge of the crime. R.118-4, Shortridge Dep., PAGE ID #
2185-86, 2188. Yet, Defendants told Martin that the getaway car was parked
behind the decedent's townhouse, telling her the path she would have used to
escape and where they would have parked. R.118-33, Martin's "Confession",
PAGE ID # 3042-45; R.118-3, Charles Dep., PAGE ID # 2107-08.

Then Defendants used Google Maps and Google Earth to show Martin the
decedent's home and the location and where the culprits' car was parked. R.118-3,
Charles Dep., PAGE ID # 2097-98, 2108; R.118-6, Martin Dep., PAGE ID # 2252;
R.118-11, Collier Dep., PAGE ID # 2549; R.118-34, Martin Letter, PAGE ID #
3056; R.118-33, Martin "Confession", PAGE ID #3043-45. After reviewing the
maps, Martin drove with counsel and Defendants to the decedent's home to show
her supposed insider's knowledge of where the house was and where the culprits'
car was parked. *Id.*; R.118-3, Charles Dep., PAGE ID # 2107-08.

At the end of the day, Martin did not present a single fact about this crime
that was not previously provided to her by Defendants. R.118-36, Dr. Leo Expert

Report, PAGE ID # 3170. And Defendants admit that they did not take a single step to corroborate Martin's inculpation of Plaintiff for this murder, despite concerns that no DNA from the scene implicated Hall, Martin, Helton, or Plaintiff, and despite concerns about Martin repeatedly asking Defendants for the facts of the case. R.118-4, Shortridge Dep., PAGE ID # 2183-84, 2186; R.118-21, Helton DNA, PAGE ID # 2709; R.118-23, Martin DNA, PAGE ID # 2713; R.118-24, Hall DNA, PAGE ID # 2715; R.118-3, Charles Dep., PAGE ID # 2084.

Defendants knew that Martin's statement contained falsities. R.118-3, Charles Dep., PAGE ID # 2109; R.118-11, Collier Dep., PAGE ID # 2549, 2550. Dr. Richard Leo—a renowned false confession expert—opined that Martin's "interrogation-induced statements on November 12, 2015 contain numerous hallmarks, characteristics and indicia of unreliability based on the social scientific research on police interrogation, psychological coercion and false statements, admissions and confessions." R.118-36, Dr. Leo Expert Report, PAGE ID # 3176.

Nevertheless, after securing the statement they needed to close the case, Defendant Charles presented the case to the grand jury, relying exclusively on Martin's supposed confession. R.118-3, Charles Dep., PAGE ID # 2109-10. Consistent with their end of the deal, after Martin confessed to murder, implicating herself, Hall, and Plaintiff, Defendants let her go home. R.118-3, Charles Dep., PAGE ID # 2047-48.

22

### D. Martin Recants Her Statement and Rescinds Her Recantation

After her statement, Martin returned home and immediately informed her grandmother that her statement to Defendants was "a lie." R.118-5, Combs Dep., PAGE ID # 2213. Three days later, upon Martin's request, she and her attorney met with Defendants Collier and Charles. R.118-3, Charles Dep., PAGE ID # 2109; R.118-11, Collier Dep., PAGE ID # 2550. At first, Martin attempted to withdraw only a part of her signed statement—her deal to avoid criminal charges had been conditioned on implicating Hall and Plaintiff. She told Defendants she had lied about Helton's involvement in the crime and the second woman was actually Shelly Poe. *Id.* Defendants knew that the DNA excluded Poe as well, so this too was false. R.118-3, Charles Dep., PAGE ID # 2110; R.118-10, DNA Results, PAGE ID # 2437.

Eventually, Martin returned to the truthful version she had told them so many times during the interrogation: her entire statement had been a lie and was false—she was not present for the murder and did not participate. R.118-3, Charles Dep., PAGE ID # 2110; R.118-11, Collier Dep., PAGE ID # 2550. On advice of counsel, however, Martin rescinded her recantation. R.118-3, Charles Dep., PAGE ID # 2110. Defendants charged Martin the next day with first-degree robbery and murder. R.118-10, Case File, PAGE ID # 2326.

### 4. Defendant Craycraft's Destruction of Evidence[2]

Based on Defendant Charles' testimony, a grand jury also issued an indictment against Hall. R.1, Complaint, PAGE ID # 23. Hall and Martin began regularly corresponding with each other about the charges. *Id,* PAGE ID # 24. In their letters, Martin admitted her statements implicating Plaintiff were false— Defendants forced her to lie and inculpate Plaintiff through coercive interrogation techniques, threats, and undisclosed promises of consideration. *Id.* Likewise, Hall's letters to Martin confirmed Plaintiff was innocent of the charges and Defendants forced Martin to go along with the false and fabricated statement. *Id.* Hall's letters to Martin also confirmed that he and Plaintiff had nothing to do with the murder, the charges were manufactured by the Defendant Officers. *Id.*

Plaintiff's defense team sought to obtain this exculpatory correspondence. *Id.,* PAGE ID # 25. To ensure preservation of the evidence, the court entered an *ex parte* sealed order for retrieval of the exculpatory letters. *Id.* Defendant Craycraft was one of the few people aware of the court order. *Id.*, PAGE ID # 25-27. After learning of the order, Defendant Craycraft "participated in the tampering and destruction of exculpatory physical evidence." *Id*., PAGE ID # 26-27. Indeed,

---

[2] The district court dismissed the claim against Defendant Craycraft at the outset of the case. R. 23, Order, PAGE ID # 222. Accordingly, for appeal of that dismissal, the facts alleged in the complaint must be credited. *See, e.g., Hudson v. Hudson*, 475 F.3d 741, 743 (6th Cir. 2007) ("Because this appeal comes to us on a motion to dismiss, we construe the complaint liberally in the plaintiffs' favor and accept all its factual allegations and inferences as true.").

phone records establish that Defendant Craycraft used his personal cellphone to call Martin and facilitate her destruction of the exculpatory letters she had. *Id.*, PAGE ID # 28. At the time he facilitated and participated in the destruction of the evidence, Defendant Craycraft "was well aware that he was removing the most critical and probative evidence remaining in the case." *Id.*, PAGE ID # 27.

### 5. Plaintiff's Prosecution

Based exclusively on Martin's supposed confession, Defendants Charles and Collier arrested Plaintiff. R.118-10, Case File, PAGE ID # 2324; R.118-4, Shortridge Dep., PAGE ID # 2163-64; R. 118-3, Charles Dep., PAGE ID # 2109-10. Defendant Charles' presentation to the grand jury was the only evidence presented in support of the indictment and: (1) omitted that the DNA evidence excluded Plaintiff and Hall; (2) told the grand jury that the DNA evidence "matched" Martin, when it all excluded her except for the one inconclusive result; (3) failed to tell the grand jury that Martin lied about Helton's and Poe's involvement; (4) omitted Martin's recantation, Defendants' threats involving Martin's children, their provision of nonpublic details to Martin, the fact that Martin did not provide Defendants with a single, correct, unfed detail about the crime, and the promises they made in exchange for Martin inculpating Plaintiff; (5) omitted that ten witnesses had inculpated Rick Mize for this offense; and (6) misinformed the grand jury that multiple witnesses corroborated Martin's account.

25

R.118-3, Charles Dep., PAGE ID # 2111-14; R.118-74, Drago Expert Report,
PAGE ID # 3540; R.118-37, GJ Testimony, PAGE ID # 3186-93; R.103-21,
Indictment, PAGE ID # 1206.

### 6. Defendants' Continued Efforts to Influence Martin's Testimony

On November 20, 2015, Martin was booked into the Montgomery County
Regional Jail.  R.118-13, Jones Dep., PAGE ID # 2657; R.118-38, Booking Sheet,
PAGE ID # 3199. Defendant Jones, a jailer, promised he would speak with
Prosecutor Defendant Craycraft to negotiate a deal for Martin's release if she
cooperated and gave a statement further implicating Plaintiff and Hall. R.118-14,
Audio PL 9036, 2:10-2:38, PAGE ID # 2693. Specifically, Jones promised Martin
he would secure a bond for her off the record. R.118-45, Audio of Call PL 9034,
2:31-2:42, PAGE ID # 3271; R.118-46, Audio of Call PL 9048, 1:27-1:45, PAGE
ID # 3272; R.118-50, PL 9049, 3:05-3:16, PAGE ID # 3327; R.118-51, Audio Call
PL 9053, 3:10-3:45; PAGE ID # 3328.

Throughout Fall 2016, Martin complained to Hall that she had been offered
instant release from jail and probation if she would incriminate him and Plaintiff,
but that she did not want to falsely incriminate them (even though she despised
Plaintiff). R.118-62, Martin Letter, PAGE ID # 3447; R.118-63, Martin Letter,
PAGE ID # 3450-51; R.118-64, Martin Letter, PAGE ID # 3457-58; R.118-65,
Martin Letter, PAGE ID # 3468.

During Martin's incarceration, Defendants Craycraft and the Defendant Officers had undocumented meetings with Martin, without her counsel present, to ensure that she stuck to her statement falsely implicating Plaintiff. R.118-5, Combs Dep., PAGE ID # 2217; R.118-39, Craycraft Dep., PAGE ID # 3214-15. At one meeting, the deal they offered Martin was "to say what they wanted her to say, then she could come home." R.118-5, Combs Dep., PAGE ID # 2216. Even after Martin was eventually released on bond, Defendants Craycraft, Charles, and Jones continued to converse with Martin by phone, without her attorney. R.118-39, Craycraft Dep., PAGE ID # 3224-27; R.118-69, Martin Phone Records, PAGE ID # 3493-94; R.118-69, Martin Phone Records, PAGE ID # 3493-94; R.118-13, Jones Dep., PAGE ID # 2665.

Martin's criminal docket shows that on June 14, 2017, her bond was reduced from $1,000,000 partially secured to $50,000, unsecured. R.118-68, Martin Criminal Docket, PAGE ID # 3485. As promised by Defendant Jones, this was "off the record"—the docket reflects no corresponding written motion, order, or hearing to secure that reduction. *Id.*, PAGE ID # 3487-88; R.118-39, Craycraft Dep., PAGE ID # 3217-19; R.118-48, Rowady Dep., PAGE ID # 3292-93. The terms of the bond agreement secured by Defendant Jones were not disclosed to Plaintiff's defense. R.118-48, Rowady Dep., PAGE ID # 3292-93.

Although the charges against Plaintiff and Hall were dismissed in 2017, Defendants continued to leverage the criminal case against Martin after Plaintiff's lawsuit was filed. In June 2020, Martin pled guilty to facilitation to murder and second-degree complicity to robbery. R.118-72, Martin Plea, PAGE ID # 3511. On Defendant Craycraft's recommendation, the court sentenced Martin to fifteen years, probated for five years, having spent only one-and-a-half years incarcerated. R.118-72, Martin Plea, PAGE ID # 3511, 3513-15; R.118- 48, Rowady Dep., PAGE ID # 3288. Martin's seasoned defense attorney could not recall another defendant who pled guilty to a murder charge and spent so little time in custody. R.118-48, Rowady Dep., PAGE ID # 3288.

### 7. The Charges Against Plaintiff Are Dismissed and This Lawsuit Ensued

With no evidence ever corroborating Martin's fabricated confession, the Commonwealth ultimately dismissed its charges against Plaintiff without prejudice on November 21, 2017. R.118-7, Motion to Dismiss, PAGE ID # 2267; R.118-8, Order, Page ID # 2269. One year later, Plaintiff filed this lawsuit based on Defendants' malicious prosecution, fabrication of false evidence, destruction of exculpatory evidence, due process violations, conspiracy, and related claims. R.1, Complaint, PAGE ID # 1-44.

Upon hearing motions for summary judgment, the district court found no material dispute of fact, ruled that Defendants were, in any case, entitled to

qualified immunity, granted the motion, dismissed all claims, and entered judgment for Defendants. R.152, SJ Opinion, PAGE ID # 3870-3905. Plaintiff appeals that ruling.

## ARGUMENT SUMMARY

Crediting Plaintiff's evidence and drawing inferences in his favor—as, of course, is required at this juncture—this is obviously not a case that can be summarily adjudicated. First, abundant evidence supports that Defendants fabricated Martin's statement inculpating Plaintiff. Because Plaintiff's charges were based exclusively on Martin's statement, a reasonable jury could certainly find that the statement affected the grand jury's decision. A reasonable jury could likewise find that the statement was fabricated by Defendants based on the facts that: it was entirely spoon-fed to Martin by Defendants (except for the demonstrably false parts); and it was only adopted after Defendants resorted to impermissible threats against Martin and her family, lied to make her falsely believe that the inculpatory evidence against her was irrefutable, and made false promises that she would "walk" for murder if she parroted back the statement.

Second, summary judgment is not warranted on Plaintiff's malicious prosecution claim. Defendants' investigative reports were rife with falsehoods and omissions that a jury could reasonably find influenced the decision to prosecute Plaintiff, particularly where there was no probable cause for the prosecution absent

Defendants' dishonest reporting and fabrication of the false statement from Martin. And third, there is sufficient evidence to support a trial on Plaintiff's derivative and state law claims, which were dismissed because the court found no underlying constitutional violation.

Additionally, the district court's immunity rulings were erroneous. Defendant Craycraft is not entitled to absolute immunity: he was not engaged in prosecutorial duties when he violated an express court order and facilitated the destruction of evidence. Nor are the Officer Defendants entitled to qualified immunity. At the time of Defendants' misconduct, it was clearly established that fabrication of evidence by inducing false testimony from a witness was unconstitutional. *See Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999). And the law was also clear that "individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff." *King v. Harwood*, 852 F.3d 568, 582-83 (6th Cir. 2017). Defendants' rampant false reporting and fabrication of evidence prevent them from hiding behind the protection of the grand jury's finding of probable cause to defeat Plaintiff's malicious prosecution claim. Accordingly, Plaintiff is entitled to a trial.

## ARGUMENT

### I.    Legal Standards for Adjudicating this Appeal

### A. Review of the District Court's Summary Judgment Rulings

The summary judgment principles are familiar: summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 481 (6th Cir. 2020). As movants, Defendants bear the burden to show the absence of a genuine dispute of material fact. *Troutman*, 979 F.3d at 481; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of facts exists when a plaintiff presents "sufficient evidence from which a jury could reasonably find in [her] favor." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). This Court reviews a district court's grant of summary judgment *de novo. Troutman*, 979 F.3d at 481. This Court also reviews *de novo* a district court's grant of summary judgment based on qualified immunity. *Webb v. United States*, 789 F.3d 647, 658 (6th Cir. 2015). In reviewing summary judgment, courts are mindful that "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 872 (6th Cir. 2020) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255)*.*

### B. Review of the District Court's Dismissal of Defendant Craycraft

In an appeal from the dismissal of a claim on a motion to dismiss, this Court "construe[s] the complaint liberally in the plaintiffs' favor and accept[s] all its factual allegations and inferences as true." *Hudson*, 475 F.3d at 743. "Whether absolute immunity protects a defendant from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006).

### II. Summary Judgment Was Erroneously Granted on Plaintiff's Fabrication of Evidence Claim

### A. Plaintiff Presents a Viable Claim Based on Fabrication of Evidence

The record presents two diametrically opposing stories of how Martin's signed statement came to exist: if her own recantation and the exclusionary DNA evidence are credited, a jury could easily conclude that Defendants forced Martin to make the videotaped false statement; if on the other hand Martin's false statement is credited, along with Defendants' versions of the interrogations, then a jury could conclude that it was not fabricated. On this record, only the jury can decide this question; taking the question away from the jury and resolving all the factual disputes *against* Plaintiff, as the lower court did, is reversible error. Quite simply, there is ample evidence in the record to create a jury question on fabrication. *See Gambrel v. Knox Ctny., Ky.*, 25 F.4th 391, 405 (6th Cir. 2022) ("In

short, this factual dispute about what happened is for the jury at trial – not for us at summary judgment.").

A plaintiff's constitutional rights are violated "when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Jackson v. City of Cleveland*, 925 F.3d 793, 815-16 (6th Cir. 2019) (citing *Gregory*, 444 F.3d at 737); *see also Webb*, 789 F.3d at 669. To prove fabrication, Plaintiff need not show that Defendants engaged in coercion or used constitutionally prohibited police tactics, although coercion can certainly provide circumstantial evidence of Defendants' intent to fabricate—as is the case here. *See Hurt v. Wise*, 880 F.3d 831, 841-42 (7th Cir. 2018) (overruled on other grounds by *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019)).

A fabrication of evidence claim can apply to evidence presented to the grand jury as well as to a trial jury. *Jackson*, 925 F.3d at 816 ("fabricated evidence that 'is used as [the] basis for a criminal charge' can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury.") (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)). *See also Sornberger v. City of Knoxville*, 434 F.3d 1006, 1026-27 (7th Cir. 2006). In *Jackson*, for instance, this Court held that the plaintiff had a viable fabrication claim defeating summary judgment by showing that if the defendants had not fabricated a witness's statement, "charges would not have been brought[.]" 925 F.3d 816-17.

The same is true here. Crediting Plaintiff's evidence and drawing inferences in his favor, there is a reasonable likelihood that a jury could find the Officer Defendants fabricated Martin's statement inculpating Plaintiff, and without the fabrication, charges never would have been brought against him. *See, e.g.,* R.118-4, Shortridge Dep., PAGE ID # 2163-64 (agreeing that aside from Martin's statement, Defendants "had not obtained any credible evidence that implicated Nickie Miller in the murder that would have justified probable cause").

As for the sufficiency of Plaintiff's evidence in support of the fabrication, Plaintiff presented evidence that: (1) Martin's statement was 100% comprised of either information Defendants affirmatively fed to her or information objectively disproven by the physical evidence; and (2) Defendants accomplished their fabrication and got Martin to adopt their proffered fictional statement using psychological coercion (most notably, threatening her children), falsely convincing her that multiple witnesses and crime scene DNA evidence irrefutably inculpated her, and repeatedly promising her that she would "walk" for the murder if she confessed to what they had fed her. *See supra* at pp. 8-23.

The Seventh Circuit found evidence sufficient to support a fabrication claim in a case with remarkably similar facts in *Hurt.* 880 F.3d at 841-42. *Hurt* held that a jury must be allowed to decide whether the defendant officers fabricated inculpatory statements adopted by suspects who, like Martin, introduced no

meaningful inculpatory information that was not fed by the officers themselves. *Id.* Summary judgment was improper in *Hurt*, even though two suspects "confessed," because in a confession "permeated with coercive tactics and fact-feeding," "a trier of fact could conclude that the officers knew that the confessions were false." 880 F.3d at 847. The same result is warranted here.

Here, Defendants either fed Martin basic facts she should have known had she been the culprit or else she wrongly guessed at answers, providing details contradicted by the physical evidence. Crediting Plaintiff's evidence, Martin did not know without being told by Defendants: (1) where the crime occurred; (2) how the crime was committed; (3) where the culprits parked their car to get to and from the crime scene; (4) the culprits' path in making their escape; (5) that the decedent had been bound to his bed (supposedly by her); (6) how many gunshots she supposedly heard; and (7) who her supposed female accomplice was who left DNA on stockings found at the crime scene.

A jury could also infer that Defendants intended to fabricate a statement and used prohibited police tactics to do so from the fact that they violated their own policies and failed to record hours upon hours of their interrogation, including immediately before Martin's supposed confession—the period when she agreed to make a statement in exchange for certain (unrecorded) benefits and presumably when more explicit promises and witness coaching would have happened. *See*

*supra* at pp. 8-23. Likewise, Defendants' efforts to hide their deal with Martin from Plaintiff's defense provides strong circumstantial evidence from which a jury could conclude Defendants were being untruthful. With no indicia of reliability, and all relevant information fed to Martin by Defendants, a jury could reasonably find that Defendants knowingly fabricated her statement. *See Hurt*, 880 F.3d at 847-48 (finding a viable fabrication of evidence claim where defendants "basically drafted the entire confession by feeding William every critical fact through suggestive questioning.").

Moreover, *Hurt* explained that spoon-feeding all the material facts in a confession supports a fabrication of evidence claim irrespective of whether the witness was coerced to adopt the resulting statement:

> An officer could sit in a room with a cooperative suspect and could politely ask that person to repeat everything the officer says. The suspect could oblige, even if the story he has been asked to parrot is a confession to a crime. Nothing about the witness's statement has been coerced, but by the same token nothing qualifies it as a reliable confession. That is not to say that coercion is completely irrelevant: to the contrary, the existence of coercion informs reliability even though it is not determinative. But the key inquiry for the Fourth Amendment remains reliability, not coercion.

*Hurt*, 880 F.3d at 841-42. *See also Illinois v. Gates*, 462 U.S. 213, 230 (1983) (listing "veracity," "reliability," and "basis of knowledge" as highly relevant in determining the value of a witness's statement); *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (probable cause depends on "reasonably trustworthy information" that a suspect committed a crime).

Thus, proof of coercion is not a requirement, but when psychological coercion is used—especially making threats against the witness' family members—this can be further evidence of the statement's unreliability. *Hurt* at 841-42, 846 ("it is clearly established that police threats against the suspect or the suspect's family are a form of psychological coercion that renders a confession involuntary," which impacts reliability). Here, Defendants resorted to extreme, heavy-handed psychologically coercive tactics, and it is well-settled that this rendered the statement even less reliable. *See, e.g., Dickerson v. United States*, 530 U.S. 428, 433 (2000) (discussing how our judicial system is based on the recognition that coerced confessions are "inherently untrustworthy"); *Llamas v. Oregon*, 548 U.S. 331, 349 (2006) (recognizing that "coerced confessions … tend to be unreliable"). A jury could reasonably find that Defendants knew Martin's ultimate inculpatory statement was an unreliable adoption of their fabrication, rather than credible evidence.

Indeed, Martin was explicit that she caved to Defendants' coercive threats to take her children and flat-out asked Defendants if they wanted her to lie: "I love my kids more than anything.  I want more than anything to tell you the truth, but you don't want [the truth] – do you want me to make something up and tell you because I do not remember?"  R.118-30, Fyffe Interrogation, PAGE ID # 2957. *See*

37

*also Id.*, PAGE ID # 2952 (Martin asking, "Can I have my lawyer or somebody? Because I don't know what I'm supposed to do here.").

Finally, Plaintiff's fabrication claim is supported by Defendants' concerted efforts to keep their case from unravelling by pressuring Martin while she was in jail, securing her an undisclosed bond deal for her release and continuing to telephone her after her release, without her counsel despite pending murder charges against her. *See supra* at pp. 26-28. A jury could find that Defendants' campaign to keep Martin on message supports the allegation that Defendants fabricated her inculpation. When all this evidence is considered collectively, as it must be, it is clear summary judgment on this claim was improper. *See, e.g, Washington v. Buraker*, 322 F. Supp. 2d 702, 712 (W.D. Va. 2004) (*aff'd sub nom. Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005)) (evaluating fabricated evidence collectively for summary judgment adjudication).

## B.    Defendants Are Not Entitled to Qualified Immunity for Their Fabrication

The district court denied a trial on this claim by erroneously holding that Defendants are entitled to qualified immunity for their fabrication of the evidence used to inculpate Plaintiff. R.152, SJ Opinion, PAGE ID # 3898-3902. To adjudicate qualified immunity, courts ask: "(1) whether, viewing the evidence in the light most favorable to the injured party, a constitutional right has been violated; and (2) whether that right was clearly established." *Webb*, 789 F.3d at

659 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A right is clearly established when "[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) (citations omitted).

At the time of Defendants' misdeeds, it was clearly established that fabrication of evidence by inducing false testimony from a witness was unconstitutional. *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999). Indeed, the facts of *Spurlock* are quite similar. In *Spurlock*, when an alleged witness, Apple, was initially confronted, "he denied any knowledge of the crime, but through pressure, threats of prosecution, and the defendants' promises to help Apple and his family, Apple agreed to implicate Spurlock and Marshall for the Malone murder." *Id.* at 998. As Defendants did here with Martin, the *Spurlock* defendants promised Apple they would secure his release from the county jail. *Id.* Paralleling this case once again, although Apple had no knowledge of the details of the crime, the defendants informed him of all the information he needed concerning the details of the crime. *Id.* The defendants then presented Apple's statements to a grand jury to secure a murder indictment. *Id.* at 999.

This Court considered whether the defendant's actions served to pressure and coerce Apple into testifying falsely, essentially "manufacturing probable cause

and fabricating evidence." *Id.* at 1002. The Court held that in so alleging,

"plaintiffs sufficiently raised claims that allege violations of their constitutional

and/or statutory rights. Namely, that … [the defendant] fabricated evidence." *Id.* at

1005. The Court rejected an assertion of qualified immunity: "Satterfield cannot

seriously contend that a reasonable police officer would not know that such actions

were inappropriate and performed in violation of an individual's constitutional

and/or statutory rights." *Id.* (citations omitted); *see also Webb*, 789 F.3d at 656,

667 (it was clearly established at the time of 2007 investigation that fabricating

evidence to implicate suspect was unconstitutional); *Gregory*, 644 F.3d at 760;

*Napue v. Illinois*, 360 U.S. 264 (1959).

The district court, however, found immunity by holding that "plaintiff has

not pointed to any authority indicating that aggressive interrogation techniques

cross the line from coercion to the unconstitutional fabrication of evidence."

R.152, SJ Opinion, PAGE ID # 3899. This overly narrow interpretation of

Plaintiff's claim is contrary to law. *See Goodwin*, 781 F.3d at 325 ("There need not

be a case with the exact same fact pattern or even 'fundamentally similar' or

'materially similar' facts; rather, the question is whether the defendants had 'fair

warning' that their actions were unconstitutional.") (quotation marks and citations

omitted). Moreover, Plaintiff proves far more than just that Defendants'

interrogation was "aggressive"—the evidence supports that they engaged in

40

rampant fact feeding to procure Martin's fabricated statement, along with undisclosed threats and promises. Accordingly, *Spurlock* is on all fours with this case. It provided ample notice that the types of techniques Defendants used here to secure the fabricated confession were unconstitutional.

The district court also attempted to refute Plaintiff's factual contention that Martin was coerced into falsely confessing, noting her education level and the fact that she was *Mirandized*. R.152, SJ Opinion, PAGE ID #3899. Those factors do not preclude a fabrication claim, however, and at best are pieces of evidence for the jury to weigh. In any event, as explained in *Hurt*, proof of coercion is not a requirement for a fabrication claim. *Hurt*, 880 F.3d at 841-42. And, regardless, a jury might ultimately disagree with that factual assessment—it impermissibly construes facts and inferences against Plaintiff, which is not allowed in summary judgment adjudication. *Hudson*, 475 F.3d at 743. Defendants are not entitled to immunity for fabricating the evidence inculpating Plaintiff.

### III.    Plaintiff is Entitled to Trial on His Malicious Prosecution Claim

Plaintiff presents sufficient evidence supporting his claim for malicious prosecution.

### A. The Elements of Malicious Prosecution Claims

The elements of a malicious prosecution claim under the Fourth Amendment are: (1) "that a criminal prosecution was initiated against the plaintiff and that the

41

defendant 'ma[d]e, influence[d], or participate[d] in the decision to prosecute'"; (2)

"that there was a lack of probable cause for the criminal prosecution"; (3) "that, 'as

a consequence of a legal proceeding,' the plaintiff suffered a 'deprivation of

liberty' ... apart from the initial seizure"; and (4) that "the criminal proceeding

must have been resolved in the plaintiff's favor." *Tlapanco v. Elges*, 969 F.3d 638,

654-55 (6th Cir. 2020) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir.

2010); citations omitted).

### B. A Trial is Warranted on Plaintiff's Malicious Prosecution Claim

#### 1. There is Sufficient Evidence for a Jury to Find Defendants Influenced and Participated in the Decision to Prosecute Plaintiff

For this element, defendants cannot "escape liability just because someone

else (e.g., the prosecutor) made the actual decision to prosecute, so long as the

plaintiff can show that the officer 'influenced or participated in the decision to

prosecute.'" *Tlapanco*, 969 F.3d at 655 (quoting *Sykes*, 625 F.3d at 311-12).

Accordingly, Defendants can be liable when they provide reports or investigative

materials "containing falsehoods, omissions, or misstatements," those materials

form the basis of the charge, and "the falsehoods, omissions, or misstatements

were made deliberately or with reckless disregard for the truth." *Tlapanco*, 969

F.3d at 655 (citation omitted).

There is enough evidence here to create a jury question on whether Defendants "influenced" the decision to prosecute—which is all that Plaintiff needs to demonstrate at summary judgment.  Indeed, in indicting Plaintiff, the *only* evidence the prosecutor presented to the grand jury was Defendant Charles' summary of Martin's supposed inculpation of Plaintiff, which included Charles' lie about a DNA "match" and other falsities and omissions. *See supra* at pp. 25-26; R.118-37, GJ testimony, PAGE ID # 3186-93; R.103-2, Indictment, PAGE ID # 1206. Critically, Defendants made material false statements and omissions about Martin's "confession" that a jury could reasonably find influenced the decision to prosecute Plaintiff, a decision made exclusively based on Martin's statement. R.118-37, GJ Testimony, PAGE ID # 3189 (Martin's statement was the only evidence presented to implicate Plaintiff); R.118-4, Shortridge Dep., PAGE ID # 2163-64 (Martin's statement the only credible evidence justifying probable cause); R.118-3, Charles Dep., PAGE ID # 2091, 2109.

First, a jury could reasonably find that Defendants' reports are replete with falsehoods about Martin's supposed inculpation:

a) The lie that Martin failed the polygraph test: Defendant Charles' report stated, "Once back at the sheriff's office I informed the sheriff that [Martin] failed miserably but was continuing with the same charade about not knowing anything." R.118-10, Case File, PAGE ID # 2321. Likewise,

Defendant Fyffe reported that deception was detected from Martin's exam. R.118-29, Polygraph Report, PAGE ID # 2797. These claims that Martin was deceptive in denying participation in the crime bolstered Martin's eventual inculpation of Plaintiff. A jury, however, could credit Dr. Leo's expert opinion that there was no evidence supporting a finding that Martin was deceptive at her polygraph, as well as Martin's testimony that she did not lie. R.118-36, Dr. Leo Expert Report, PAGE ID # 3155.

b) The lie to hide that Martin did not know her supposed accomplice:

Defendants were aware that Martin's naming of Helton as her accomplice was disproven by the DNA. R.118-3, Charles Dep., PAGE ID # 2051, 2106; R.118-4, Shortridge Dep., PAGE ID # 2182-83; R.118-10, Case File, PAGE ID # 2432, 2439. They tried to finesse this highly problematic discrepancy, which refutes her knowledge of the crime, and thus, implicitly, her inculpation of Plaintiff, by suggesting her uncertainty in the report: "[Martin] stated that she thought it was either [Kennie] Helton or [Kayla] Walters." R.118-10, Case File, PAGE ID # 2322. A jury could reasonably find that characterization to be false, given the actual exchange between Charles and Martin:

> MARTIN:        it was [Kennie Helton].
>
> DETECTIVE:     Are you 100 percent positive?

44

…

DETECTIVE:      Not even second-guessing yourself?

DETECTIVE:      You're shaking your head, honey. We need you to say "yes" or "no."

MARTIN:         Yes, I'm positive.

R. 118-33, Martin "Confession", PAGE ID # 3037.

c) <u>The lie to hide that Martin did not know where the culprits parked</u>: Martin guessed wrong when she told Defendants where the culprits' car was parked, undermining her claim of knowledge of the offense and therefore her inculpation of Plaintiff. *See* R.118-33, Martin "Confession", PAGE ID # 3042. Defendants knew her guess conflicted with the physical evidence. R.118-10, Case File, PAGE ID # 2282. So, Defendants corrected Martin, telling her where the getaway car was parked and the path she would have used to escape. R.118-33, Martin "Confession", PAGE ID # 3042-45; R.118-3, Charles Dep., PAGE ID # 2107-08. Defendants even used Google Maps and Google Earth to instruct Martin on the correct locations. R.118-3, Charles Dep., PAGE ID # 2097-98, 2108; R.118-6, Martin Dep., PAGE ID # 2252; R.118-11, Collier Dep., PAGE ID # 2549; R.118-34, Martin Letter, PAGE ID # 3056; R.118-33, Martin "Confession", PAGE ID #3043-45. To cover Martin's lack of knowledge, Defendants' report invented, "Natasha stated that Nick drove the car and she believed they parked on the street and

let the girls out and then the guys drove off." R.118-10, Case File, PAGE ID # 2322. Then Defendants falsely reported that Martin correctly identified where the car was parked after the crime. *Id.*, PAGE ID # 2323.

d) <u>False pre-polygraph corroboration</u>: Defendant Fyffe's pre-polygraph report stated, "Further investigation disclosed that this examinee had made statements to people indicating that she was present when the victim was shot. There is also evidence indicating that the examinee was present at the crime scene." R.118-29, Pre-Polygraph Report, PAGE ID # 2796; *see also Id.*, PAGE ID # 2810 ("investigation disclosed examinee told two other people this was supposed to be robb[ery] only no murder"). This supposed corroboration for Martin's eventual statement is also false. *See supra* at pp. 6-8, 12-15.

e) <u>Martin's supposed Mt. Sterling lie</u>: Defendants' case report falsely claimed that upon being told that the murder happened in Mt. Sterling, Martin said that the only place in Mt. Sterling where she had ever been was Bartley House bar. R.118-10, Case File, PAGE ID # 2321. What Martin told the officers, however, was that the only place she had been to in Mount Sterling "with Cody" was Bartley House. R.118-28, Martin Interrogation, PAGE ID # 2753-54. When Martin later volunteered that she used to live in Mt. Sterling, Defendants reported, "This obviously was a huge contradiction to

her earlier statement that she never came around Mt. Sterling except going to Bartley's to party." *Id.* This, however, was a false claim that Martin lied, used to undermine her credibility when she asserted that she had no knowledge of the crime. *Compare* R.118-28, Martin Interrogation, PAGE ID # 2753-54; and *Id.*, PAGE ID # 2773. There simply was no "huge contradiction" in Martin's statements that she knew nothing of this crime. Each of these falsehoods served to bolster Martin's fabricated inculpation of Plaintiff or hide information that would have fatally undermined it. A reasonable jury could find that the false reporting influenced the prosecution.

In addition to these false statements, a jury could reasonably find that had the prosecutor known all the serious problems with Martin's potential testimony, the Commonwealth would not have pursued charges against Plaintiff. Defendants' reports of Martin's supposed inculpation of Plaintiff omitted that Martin only gave her confession after Defendants: (1) failed to record large swaths of the interrogations; (2) falsely told Martin that her DNA proved she committed the crime and that several people had implicated her in sworn statements; (3) fed her all the information that she correctly related about the crime; (4) falsely told her that she did not pass the polygraph test; (5) threatened both her and her children; and (6) repeatedly promised her that she would "walk" if she gave the statement Defendants sought. *See supra* at pp. 8-23. Indeed, this conclusion is supported by

47

the fact that the Commonwealth ultimately moved to dismiss its charges against both Hall and Plaintiff, both of which were wholly reliant on Martin's inculpation. R.118-3, Charles Dep., PAGE ID # 2043; R.118-7, Motion to Dismiss, PAGE ID # 2267; R.118-8, Order, Page ID # 2269.

This evidence suffices to meet the first element for malicious prosecution. Notably, the district court did not find otherwise. *See* R.152, SJ Opinion, PAGE ID # 3893-98.

### 2. Absent Martin's Fabricated Statement, There Was No Probable Cause to Prosecute Plaintiff

With regards to the second element, probable cause, "Where an officer falsifies the evidence that purports to provide probable cause, that fact typically goes a long way in justifying a malicious prosecution claim brought in a § 1983 action." *Davis v. Gallagher*, 951 F.3d 743, 749 (6th Cir. 2020). When the facts underlying probable cause are disputed, a jury must decide the issue. *See, e.g., Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005); *Gregory*, 444 F.3d at 743; *Webb*, 789 F.3d at 665.

Ordinarily, there is a "presumption of probable cause created by the grand-jury indictment." *King*, 852 F.3d at 586. "But a tainted grand-jury indictment cannot provide a basis for probable cause." *Leath v. Webb*, 323 F. Supp. 3d 882, 895 (E.D. Ky. 2018) (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017)). Accordingly, this presumption can be rebutted where: (1) an officer, "in

48

the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence"; (2) the false statements and evidence and any misleading omissions are material plaintiff's prosecution; and (3) the false statements, evidence, and omissions "do not consist solely of grand-jury testimony or preparation for that testimony[.]" *King*, 852 F.3d at 587-88.

The district court found that Plaintiff failed to rebut the presumption of probable cause because it found "no suggestion that any particular facts were falsified or omitted in Charles' affidavits or reports or that any officer knowingly or recklessly misled a judge or prosecutor." R.152, SJ Opinion, PAGE ID # 3895. This ruling is erroneous. As detailed above, in addition to Defendant Charles' false testimony to the grand jury, Defendants' reports contained numerous false statements and misleading omissions. Those deceptions were necessarily material to the decision to prosecute Plaintiff because the prosecutorial decision was 100% reliant on Martin's fabricated inculpatory statement. Defendants' reporting failed to disclose their fabrication and coercion of Martin and hid Defendants' deception with numerous affirmative lies. There is sufficient evidence for a jury to find that Plaintiff overcomes the presumption of probable cause.

### 3.     Plaintiff Suffered a Deprivation of Liberty

The third requirement, that Plaintiff suffered a deprivation of liberty was not

contested below (nor was there a basis to), thus it cannot be resurrected on appeal.

*See, e.g., Cataldo v. United States Steel Corp.*, 676 F.3d 542, 555 (6th Cir. 2012).

### 4.     Plaintiff Presents Sufficient Evidence of Favorable
#####        Termination of His Criminal Proceedings

A plaintiff meets the favorable-termination element and shows a criminal

proceeding has been invalidated in a manner consistent with malicious prosecution

by demonstrating that "dismissal indicates that [he] may be innocent of the

charges[.]" *Jones v. Clark County*, 959 F.3d 748, 765 (6th Cir. 2020) (citations

omitted). "[T]he determination of whether a termination is sufficiently favorable

ultimately rests with the trial court as a matter of law, absent a factual dispute

relative to the circumstances of the dismissal." *Id.* (citations omitted). The district

court did not find insufficient evidence of favorable termination. R.152, SJ

Opinion, PAGE ID # 3893-98.

Plaintiff establishes that the criminal proceedings were resolved in his favor

because the prosecutor moved to dismiss the charges against him in a manner

indicative of his innocence or indicative that "a conviction has become impossible

or improbable." Restatement (Second) of Torts § 660 cmt. (d) (1977); *Id.*, cmt. (e)

(favorable termination can be established via "formal abandonment of criminal

proceedings" as evidenced by "a motion to dismiss the complaint"); *Jones*, 959

50

F.3d at 765 (dispute of fact sufficient to overcome summary judgment present where prosecutor dismissed charges, "no new charges have been brought against Jones and no additional evidence has been discovered."). *See* R.118-9, Dismissal Hearing, PAGE ID # 2270 at 12:07:40. Specifically, once Martin's statement unraveled, there was no evidence to support prosecuting Plaintiff, so the Commonwealth dismissed the charges against him. A jury could find favorable termination.

### 5. Plaintiff Presents Sufficient Evidence on All Elements of This Claim

Plaintiff presents sufficient evidence to require a jury trial on his malicious prosecution claim. Moreover, Defendants are not entitled to qualified immunity. This Court found the law for malicious prosecution clearly established in 1998, long before the misdeeds in this case. *King*, 852 F.3d at 582-83 ("[I]ndividuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has made, influenced, or participated in the decision to prosecute the plaintiff."); *Spurlock*, 167 F.3d at 1006-07 ("a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would also be unlawful."). Plaintiff respectfully asks the Court to reverse dismissal of this claim.

**IV.    The Complaint's Claim Against Defendant Craycraft Should Be Reinstated**

Defendant Craycraft is not entitled to absolute immunity for the destruction of evidence claim. "[A]ctions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Rather, prosecutors are entitled to absolute immunity for activities "intimately associated" with the judicial process, such as initiating and pursuing criminal prosecutions. *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976); *see also Howell v. Sander*s, 668 F.3d 344, 349 (6th Cir. 2012) ("prosecutors are absolutely immune from civil liability when acting within the scope of their prosecutorial duties"). In other words, "When a prosecutor is performing the functions of an advocate rather than investigator, a prosecutor is protected by absolute immunity." *Peroli v. Huber*, 2021 WL 5411215, at *4 (6th Cir. Nov. 19, 2021). "[But] when a prosecutor 'functions as an administrator rather than as an officer of the court' he is entitled only to qualified immunity." *Buckley*, 509 U.S. at 272 (quoting *Imbler*, 424 U.S. at 431 n.33). Absolute immunity is a doctrine to be invoked sparingly. *Burns v. Reed*, 500 U.S. 478, 485-86 (1991) ("We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant.") (internal quotation marks and citations omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (noting that

"[f]or executive officers in general, ... qualified immunity represents the norm");

*Butz v. Economou*, 438 U.S. 478, 507 (1978).

Thus, the question for this Court is whether Defendant Craycraft's facilitation of the destruction of evidence, contravening a court order, constitutes performance of prosecutorial functions entitled to absolute immunity. Defendant Craycraft is not entitled to absolute immunity, for three reasons: (1) destruction of exculpatory evidence is not a prosecutorial function; (2) the act of advising constitutes an investigative, rather than advocacy function; and (3) violation of a court order is not a prosecutorial function.

First, this Court has never held a prosecutor immune for destroying exculpatory evidence. *See Hatchett v. City of Detroit*, 495 F. App'x 567, 571 (6th Cir. 2012) ("we do not express any opinion as to whether a prosecutor's absolute immunity would extend to his destruction of exculpatory evidence."). It should not do so: the destruction of exculpatory evidence is not a prosecutorial function entitled to absolute immunity. *See, e.g., Yarris v. County of Delaware*, 465 F.3d 129, 137 (3d Cir. 2006) (prosecutor "not entitled to absolute immunity from suit for constitutional violations caused by their alleged deliberate destruction of exculpatory evidence"); *Munchinski v. Solomon*, 747 F. App'x 52, 57 (3d Cir. 2018) ("knowing failure to preserve exculpatory evidence, much like the knowing destruction of exculpatory evidence, is not part of the prosecutorial function and

therefore not entitled to absolute immunity"); *Wilkinson v. Ellis*, 484 F. Supp. 1072, 1082-85 (E.D. Pa. 1980) (while decision not to tender evidence to defense is an advocacy decision, entitled to absolute immunity, decision to destroy evidence is an investigative action, entitled only to qualified immunity). Absolute immunity is "strong medicine, justified only when the danger of officials' being deflected from the effective performance of their duties is very great." *Forrester v. White*, 484 U.S. 219, 230 (1988) (brackets and citation omitted). The ability to intentionally destroy exculpatory evidence is not entitled to such strong medicine.

Second, Plaintiff alleges that Defendant Prosecutor Craycraft advised Martin to destroy the letters she had exculpating Plaintiff. *Supra* at pp. 24-25. When prosecutors advise, they are acting in an investigative rather than advocate function, so absolute immunity does not apply. *See, e.g., Watkins v. Healy*, 986 F.3d 648, 661 (6th Cir. 2021) (as corrected on denial of reh'g *en banc* (Mar. 16, 2021), cert. denied, 142 S. Ct. 348 (2021)) (citing *Burns v. Reed*, 500 U.S. 478, 487 (1991)) ("Prosecutors act as investigators and are entitled at most to only qualified immunity when giving 'legal advice to the police'"); *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009).

And third, the act of thwarting a valid court order is not a prosecutorial function entitled to absolute immunity. *See, e.g., Gagan v. Norton*, 35 F.3d 1473, 1476 (10th Cir. 1994) ("we cannot agree with the district court that a prosecutor's

actions in allegedly countermanding a state court judge's order… constitutes the type of conduct protected by absolute immunity under *Imbler* and its progeny."); *Chrissy F. by Medley v. Mississippi Dep't of Pub. Welfare*, 925 F.2d 844, 850-51 (5th Cir. 1991) (prosecutor not entitled to absolute immunity for action taken in violation of court order); *Odd v. Malone*, 538 F.3d 202, 215 (3d Cir. 2008).

Plaintiff's claims against Defendant Craycraft should be reinstated.

## V.    Plaintiff's Derivative Federal Claims and State Law Claims Should Be Reinstated

The district court cursorily dismissed Plaintiff's remaining federal claims—failure to supervise, failure to intervene, and civil conspiracy—by holding that the court's failure to find an underlying constitutional violation defeated those claims. R.152, SJ Opinion, PAGE ID # 3902. Because the underlying constitutional claims have merit and there is sufficient evidence to go forward on these claims, each should be reinstated.

### A.    Plaintiff's Failure to Intervene Claim Merits a Trial

A reasonable jury could find Defendants liable under § 1983 when they failed to intervene to prevent each other's constitutional violations. To prove a claim, Plaintiff must merely show that the defendants "(1) observed or had reason to know that [constitutional harm] would be or was [taking place], and (2) had both the opportunity and the means to prevent the harm from occurring." *Sheffey v. City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (citation omitted). A claim is

viable even if the individual violating the plaintiff's constitutional rights supervises the officer failing to intervene. *Smith v. Heath*, 691 F.2d 220, 224-25 (6th Cir. 1982).

Here, Defendants failed to intervene to stop a violation of Plaintiff's constitutional rights: none intervened when observing each other feed Martin information, threaten her, lie to her, or make false promises to fabricate her inculpation of Plaintiff. A reasonable jury could conclude Defendants "had reason to know" that a constitutional harm was occurring and that they all "had both the opportunity and the means to prevent the harm from occurring." *Sheffey*, 564 F. App'x at 793. Accordingly, the record presents a triable issue on Plaintiff's failure to intervene claim.

### B.    A Trial is Warranted on Plaintiff's Federal Conspiracy Claim

A § 1983 conspiracy claim suffices when a reasonable jury could infer the existence of a "single plan," sharing in the general objective of depriving the plaintiff of his constitutional rights, and "an overt act was committed in furtherance of the conspiracy that caused [the plaintiff's] injury." *Webb*, 789 F.3d at 670. Plaintiff's evidence ably supports such a claim.

The officer Defendants openly admitted, for instance, that they were collaborating with Defendant Fyffe to convince Martin that if she did not give a statement, she would lose her children, and to relay certain nonpublic details of the

56

crime to Martin. *E.g.,* R.118-3, Charles Dep., PAGE ID # 2097-2100, 2103-05;

R.118-4, Shortridge Dep., PAGE ID # 2175-77. The Defendant Officers premised

the polygraph examination on their earlier fictions that Martin had already

confessed and that DNA evidence at the scene inculpated her, and then fully

endorsed Defendant Fyffe picking up the mantle and feeding Martin the

information she needed to include in the inculpatory statement. They all used a

version of the same lies, promises, and threats to persuade Martin. And Defendants

Jones and Craycraft worked with Charles and Collier after Martin's release to

make sure she maintained their story. This is sufficient evidence of a single plan,

shared objective, and overt acts to deprive Plaintiff of his constitutional rights,

supporting Plaintiff's conspiracy claim.

### C.    A Trial is Warranted on Supervisory Liability

Plaintiff defeats summary judgment on his supervisory liability claim if he

presents evidence, *inter alia*, showing that Defendant Shortridge "actively

participated in the alleged unconstitutional conduct or 'implicitly authorized,

approved or knowingly acquiesced in the alleged unconstitutional conduct of an

offending subordinate.'" *Webb*, 789 F.3d 659 (citation omitted). *See also Ashcroft

v. Iqbal*, 556 U.S. 662, 694-95 (2009). The evidence shows that Defendant

Shortridge was an active participant, along with Charles and Collier, in coercing

and fabricating Martin's statement, participating directly in the threats, lies, and feeding of information. This claim deserves a trial.

**D.    Plaintiff's State Law Claims Should Be Reinstated**

The district court granted summary judgment on Plaintiff's state law malicious prosecution claim based on same reasoning it used for dismissal of the federal claim. R.152, SJ Opinion, PAGE ID # 3903. For the reasons argued above, that claim should be reinstated. *See supra* at Argument § III. Likewise, Plaintiff's state law claim for negligent supervision should be reinstated, as the court's reasoning tracks the arguments on the federal claim, which remains viable, as argued above. R.152, SJ Opinion, PAGE ID # 3903.[3]

## CONCLUSION

Plaintiff respectfully asks this Court to reverse summary judgment and remand this case for trial. There is sufficient evidence to support his claims and Defendants are not entitled to immunity.

Respectfully submitted,

DATED:  April 1, 2022                          /s/ Debra Loevy

---

[3] The court correctly noted that Plaintiff is no longer pursuing his municipal liability claim.

Debra Loevy
Elliot Slosar
Amy Robinson Staples
Margaret Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd Fl.
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF COMPLIANCE UNDER FRAP 32(g)

I, Debra Loevy, an attorney, hereby certify that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,997 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This brief complies with the typeface and type style requirements of FED. R. APP. P. 32(a)(5) and 32(a)(7) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point for the body and footnotes.

s/ Debra Loevy

## CERTIFICATE OF SERVICE

I, Debra Loevy, an attorney, certify that I filed the foregoing Brief of Appellant Lisa Price, Personal Representative of the Estate of Nickie Miller on April 1, 2022 via CM/ECF, thereby delivering it to counsel of record via CM/ECF.

s/ Debra Loevy

# ADDENDUM:
## Designation of Relevant District Court Documents
## from 5:18-cv-619

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| R.1 | Complaint | 1-44 |
| R.99 | Motion for Summary Judgment by John Fyffe | 629-630 |
| R.99-1 | Memorandum in Support of Summary Judgment | 631-653 |
| R.99-2 | Deposition of John Fyffe | 654-810 |
| R.99-3 | Answers to Interrogatories | 811-824 |
| R.99-4 | Documents and Reports | 825-889 |
| R.99-5 | Video Filed Conventionally | 890-891 |
| R.99-6 | Natasha Martin Sentence and Guilty Plea | 892-894 |
| R.99-7 | Excerpts of Ralph Charles Deposition | 895-911 |
| R.99-8 | Grand Jury Transcript | 912-927 |
| R.103 | Motion for Summary Judgment by Charles, Jr. et al | 935-936 |
| R103-1 | Memorandum in Support of Motion for Summary Judgment | 937-996 |
| R103-2 | KYBRIS Report | 997-1053 |
| R103-3 | Evidence Log | 1054 |
| R103-4 | Checking Account Statements | 1055-1071 |
| R103-5 | Letter Dated Oct. 31, 2011 | 1072-1073 |
| R103-6 | Andrew Wilson Statement | 1074 |
| R103-7 | Interview Transcript, Sept. 4, 2012 | 1075-1083 |
| R103-8 | DNA Forensic Examination | 1084-1097 |
| R103-9 | Kennia Helton Statement | 1098-1099 |
| R103-10 | Larrison Statement | 1100-1101 |
| R103-11 | Polygraph Examination, Nov. 12, 2015 | 1102-1151 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| R103-12 | Interview Transcript, Nov. 12, 2015 | 1152-1174 |
| R103-13 | Polygraph Information Form | 1175 |
| R103-14 | Polygraph Report, Nov. 12, 2015 | 1176-1177 |
| R103-15 | Interview Transcript, Nov. 12, 2015 | 1178-1191 |
| R103-16 | Complaint Warrant for Cody Hall | 1192 |
| R103-17 | Uniform Citation | 1193 |
| R103-18 | Polygraph Report | 1194 |
| R103-19 | Grand Jury Hearing Transcript | 1195-1202 |
| R103-20 | Cody Hall Indictment | 1203-1204 |
| R103-21 | Nickie Miller Indictment | 1205-1206 |
| R103-22 | Mize Polygraph Report | 1207-1208 |
| R103-23 | Facility Admission Report | 1209 |
| R103-24 | Detailed Release Report | 1210 |
| R103-25 | Order, Nov. 20, 2017 | 1211 |
| R103-26 | Docket Report, 15-CR-251 | 1212-1225 |
| R103-27 | Judgment | 1226-1228 |
| R103-28 | Answers to Interrogatories | 1229-1256 |
| R103-29 | Subpoena to Montgomery County Prosecutor's Office | 1257-1262 |
| R103-30 | Response to Subpoena | 1263-1266 |
| R.112 | Motion to Exclude Dr. Richard Leo | 1575-1576 |
| R.112-1 | Memorandum in Support of Motion to Exclude Dr. Richard Leo | 1577-1587 |
| R.112-2 | Deposition of Dr. Richard Leo | 1588-1606 |
| R.112-3 | Report of Dr. Leo | 1607-1660 |
| R.118 | Plaintiff's Response to Defendants Motions for Summary Judgment | 1710-1834 |
| R.118-1 | Exhibit List | 1835-1837 |
| R.118-2 | Nickie Miller Deposition | 1838-2035 |
| R.118-3 | Ralph Charles, Jr.  Deposition | 2036-2153 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| R.118-4 | Fred Shortridge Deposition | 2154-2203 |
| R.118-5 | Jewell Combs Deposition | 2204-2234 |
| R.118-6 | Natasha Martin Deposition | 2235-2265 |
| R.118-7 | Motion to Dismiss | 2266-2267 |
| R.118-8 | Motion to Dismiss Order | 2268-2269 |
| R.118-9 | Nov. 21, 2017 Video | 2270 |
| R.118-10 | MCD Brewer Investigation File 1 | 2271-2502 |
| R.118-11 | Mark Collier Deposition | 2503-2556 |
| R.118-12 | John Fyffe Deposition | 2557-2610 |
| R.118-13 | Eric Jones Deposition | 2611-2692 |
| R.118-14 | Audio Call | 2693 |
| R.118-15 | Parole Request Form | 2694-2695 |
| R.118-16 | Miranda Warning | 2696-2697 |
| R.118-17 | Robinson Recording | 2698 |
| R.118-18 | Forensic Report | 2699-2701 |
| R.118-19 | Forensic Report | 2702-2704 |
| R.118-20 | Forensic Report | 2705-2707 |
| R.118-21 | Forensic Report | 2708-2709 |
| R.118-22 | Forensic Report | 2710-2711 |
| R.118-23 | Forensic Report | 2712-2713 |
| R.118-24 | Forensic Report | 2714-2715 |
| R.118-25 | Forensic Report | 2716-2717 |
| R.118-26 | N.M. 11/12/2015 Recording No. 1 | 2718 |
| R.118-27 | N.M. 11/12/2015 Recording No. 3 | 2719 |
| R.118-28 | N.M. Interrogation Tr. No. 1 | 2720-2783 |
| R.118-29 | KSP Investigative File | 2784-2832 |
| R.118-30 | Polygraph Transcript (Interrogation 2) | 2833-2979 |
| R.118-31 | Polygraph Video | 2980 |
| R.118-32 | James Davis Deposition | 2981-3013 |
| R.118-33 | N.M. 11/12/2015 Transcript No. 3 | 3014-3053 |
| R.118-34 | Dec. 20, 2016 Letter | 3054-3057 |
| R.118-35 | Dr. Leo CV | 3058-3122 |
| R.118-36 | Dr. Leo Report | 3123-3181 |
| R.118-37 | Grand Jury Transcript | 3182-3198 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| R.118-38 | Martin Booking Sheet | 3199-3202 |
| R.118-39 | Keith Craycraft Deposition | 3203-3258 |
| R.118-40 | Audio Call | 3259 |
| R.118-41 | Audio Call | 3260 |
| R.118-42 | 20-CI-90147, Courtnet | 3261-3262 |
| R.118-43 | Article | 3263-3269 |
| R.118-44 | Audio Call | 3270 |
| R.118-45 | Audio Call | 3271 |
| R.118-46 | Audio Call | 3272 |
| R.118-47 | Audio Call | 3273 |
| R.118-48 | Alex Rowady Deposition | 3274-3325 |
| R.118-49 | Audio Call | 3326 |
| R.118-50 | Audio Call | 3327 |
| R.118-51 | Audio Call | 3328 |
| R.118-52 | Audio Call | 3329 |
| R.118-53 | Transcript of Calls | 3330-3405 |
| R.118-54 | Amanda Liebisch Booking Detail | 3406-3412 |
| R.118-55 | Amanda Liebisch Phone Records | 3413-3427 |
| R.118-56 | Amanda Liebisch Text Records | 3428-3430 |
| R.118-57 | Audio Call | 3431 |
| R.118-58 | Audio Call | 3432 |
| R.118-59 | Subpoena to Jones for Phone Records | 3433-3434 |
| R.118-60 | Jones Contempt Motion | 3435-3438 |
| R.118-61 | Aug. 1, 2016 Letter | 3439-3444 |
| R.118-62 | Undated Letter | 3445-3447 |
| R.118-63 | Sept. 28, 2016 Letter | 3448-3453 |
| R.118-64 | Oct. 11, 2016 Letter | 3454-3461 |
| R.118-65 | Nov. 24, 2016 Letter | 3462-3469 |
| R.118-66 | Nov. 2, 2016 Letter | 3470-3476 |
| R.118-67 | Dec. 9, 2016 Letter | 3477-3483 |
| R.118-68 | Martin Courtnet Printout | 3484-3491 |
| R.118-69 | Martin Phone Records | 3492-3494 |
| R.118-70 | Ex Parte Order | 3495-3497 |
| R.118-71 | Martin Phone Records | 3498-3509 |

| Record Entry Number | Document Description | Page ID# Range |
|---|---|---|
| R.118-72 | Martin Plea Doc. | 3510-3517 |
| R.118-73 | Martin Sentencing Video | 3518 |
| R.118-74 | Drago Report | 3519-3555 |
| R.129 | Response to Dkt. 112, Motion to Exclude Dr. Richard Leo | 3580-3597 |
| R.129-1 | Dr. Richard Leo Report | 3598-3655 |
| R.129-2 | Dr. Richard Leo CV | 3656-3719 |
| R.133 | Reply by Defendants Charles, Jr. et al to Motion for Summary Judgment | 3731-3760 |
| R.136 | Reply to Response of Motion to Exclude Dr. Richard Leo | 3764-3772 |
| R.137 | Reply by John Fyffe for Motion for Summary Judgment | 3773-3786 |
| R.152 | Memorandum & Order | 3870-3905 |
| R.153 | Judgment | 3906-3907 |
| R.154 | Notice of Appeal | 3908-3909 |

/s/ Debra Loevy
Counsel of Record for Plaintiff-
Appellant Lisa Price, Personal
Representative of the Estate of Nickie Miller

Debra Loevy
Elliot Slosar
Amy Robinson Staples
Margaret E. Campbell
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900

64